904 So.2d 662 (2005)
Randy HANKS, et al.
v.
Dr. A. Kent SEALE, et al.
No. 2004-C-1485.
Supreme Court of Louisiana.
June 17, 2005.
*663 Lundy & Davis, LLP, Michael Keith Prudhomme, Thomas Patrick LeBlanc, Lake Charles, Counsel for Applicant.
Raggio, Cappel, Chozen & Berniard, L. Paul Foreman, Vamvoras & Schwartzberg, LLC, Glen D. Vamvoras, Rudie Ray Soileau, Jr., Lake Charles, Counsel for Respondent.
KIMBALL, Justice.
We granted certiorari primarily to consider the issue of whether the Louisiana Patient's Compensation Fund is allowed to appeal a trial court's judgment of liability against a qualified health care provider when the provider has opted to forego his statutory right to appeal the judgment of liability and has instead satisfied the judgment rendered against him by paying plaintiff the amount owed. For the reasons that follow, we conclude the Fund's interest in this appeal is limited to the issue of excess damages and, as such, it is precluded from contesting the judgment of liability that became final upon the provider's satisfaction of judgment. We also determine that the evidence adduced at trial supports the jury's award of future medical expenses to plaintiff based on the severity *664 of his condition and the likelihood of future complications and surgeries.

Facts and Procedural History
The facts of this case are largely undisputed. At the recommendation of his family doctor, Dr. Randall Wagman, Randy Hanks ("plaintiff") sought treatment for his esophageal reflux condition from defendant Dr. Walter Ledet on January 15, 1997. Dr. Ledet performed a diagnostic procedure known as an esophagogastroduodenoscopy ("EGD") and diagnosed plaintiff with a severe case of esophagitis, an inflammation of the esophagus. Six weeks later, and after a course of prescribed medication for the condition, Dr. Ledet performed a second EGD on plaintiff and found the inflammation was almost completely healed. However, plaintiff continued to suffer from an esophageal reflux condition.
In March 1998, plaintiff returned to his family doctor, Dr. Wagman, seeking to resolve his esophageal reflux condition. Dr. Wagman again referred plaintiff to Dr. Ledet. On April 7, 1998, Dr. Ledet scheduled plaintiff for surgery at West Calcasieu-Cameron Hospital to correct the esophageal reflux condition. This type of elective surgery, which involved the repair of a hiatal hernia and a Nissen fundoplication, usually involves a hospital stay of two to three days.
On April 13, 1998, Dr. Ledet, with the assistance of his partner, Dr. Kent Seale, performed the surgery on plaintiff. Following the surgery, plaintiff developed complications, including necrosis of the stomach tissue and infection in the abdominal cavity, which required several additional surgeries. Plaintiff was not released from the hospital until May 30, 1998. Since that time, plaintiff has been hospitalized many times and has undergone additional surgeries for problems and complications related to the initial surgery.
On April 8, 1999, in accordance with the Louisiana Medical Malpractice Act ("MMA"), plaintiff submitted a request for a medical review proceeding. Following their review of the case, the three doctors on the panel issued differing opinions. All three doctors agreed that both Drs. Ledet and Seale had met the applicable standards of care regarding the surgery and the post-operative care of plaintiff. However, each panel member issued a different opinion regarding the issue of plaintiff's preoperative care. Dr. Baron Newton found the doctors' failure to perform EGD and manometry tests prior to the surgery deviated from the preoperative standard of care. Dr. Forrest Dean Griffen opined that the doctors' failure to perform a preoperative manometry study on esophageal motility was a breach of the standard of care; however, he concluded this breach did not cause the complications or subsequent problems suffered by plaintiff. Finally, Dr. Meyer Kaplan believed the preoperative care as well as all subsequent care by Drs. Ledet and Seale met the necessary standard of care.
Following the issuance of the medical review panel's opinion, plaintiff and his wife, Debra, individually and on behalf of their minor daughter, Kristina, filed a medical malpractice suit against Drs. Ledet and Seale. A trial by jury was subsequently held, with the jury finding in favor of plaintiff and his wife and assessing various damage awards. In response to special jury interrogatories, the jury found that plaintiffs had proven by a preponderance of the evidence the applicable standard of care in connection with plaintiff's treatment, that the treatment performed by Drs. Ledet and Seale breached this standard of care, and that this breach caused the injuries suffered by plaintiff. The jury awarded damages totaling $4,146,793.32 to plaintiff. This total award *665 included damages in the amounts of $500,000.00 for past and future physical pain and suffering, $200,000.00 for past and future mental anguish, $628,860.32 for past medical expenses, $2,435,040.00 for future medical expenses, $100,000.00 for loss of enjoyment of life, $56,686.00 for past wages, and $226,207.00 for future wages/earning capacity. The jury also awarded plaintiff's wife $75,000.00 for her loss of consortium claim, but found that plaintiff's daughter did not prove a loss of consortium. On May 2, 2003, the district court issued judgment in accordance with the jury's verdict, assessing damages of $100,000 plus interest against each of the two doctors, and finding the State Treasurer's Office and the Office of Risk Management liable for the remaining damages subject to the limits provided in the MMA. The district court additionally assessed various items of costs against defendants.
Following the district court's denial of their motion for a judgment notwithstanding the verdict or, in the alternative, a motion for a new trial, Drs. Ledet and Seale each paid the statutory maximum of $100,000 plus interest, thereby satisfying the judgment against them and foregoing their rights to appeal. Subsequently, the Louisiana Patient's Compensation Fund (hereinafter "the Fund") intervened and filed a petition for suspensive appeal, which was granted by the district court on June 9, 2003.
The court of appeal affirmed the judgment of the district court, finding the Fund was precluded from contesting the liability of the doctors in light of their payments of $100,000 each. Hanks v. Seale, 04-9 (La.App. 3 Cir. 5/12/04), 872 So.2d 647. In reaching its decision, the court of appeal relied upon this court's decision in Koslowski v. Sanchez, 576 So.2d 470 (La.1991), overruled in part by Russo v. Vasquez, 94-2407 (La.1/17/95), 648 So.2d 879, for the proposition that the doctors' payments of $100,000 pursuant to the district court's judgment established their liability. The court of appeal concluded that because the doctors admitted their liability up to the statutory maximum, the Fund could not contest their liability.
The court of appeal also affirmed the district court's award of future medical expenses, finding that the jury's determination that plaintiff is entitled to future medical damages was clearly supported by the record. The court of appeal pointed out that the judgment did not require a lump sum payment of this award, that the Fund will be required to pay plaintiff's future medical costs as they become due, and that all future medical payments should be paid in accordance with the procedures detailed in the MMA.
Upon the Fund's application, we granted certiorari primarily to consider the issue of whether the Fund is entitled to contest the physicians' liability on appeal when the physicians have paid the statutory maximum amount in satisfaction of judgment and have forgone their rights to appeal. Hanks v. Seale, 04-1485 (La.10/14/04), 883 So.2d 1039.

Law and Discussion
In its first assignment of error, the Fund asserts the court of appeal erred in concluding that a post-judgment payment by a qualified health care provider in satisfaction of the judgment against him "gives rise to the statutory admission of liability provided for in La. R.S. 40:1299.44(C)(5)(a)" such that the Fund is precluded from contesting liability on appeal. Additionally, the Fund asserts that to the extent this court's opinion in Koslowski supports the court of appeal's judgment, it should be overruled.
In 1975, the legislature enacted the MMA, La. R.S. 40:1299.41 et seq., to establish a framework for compensating persons *666 who are injured as a result of medical malpractice committed by qualified health care providers. Bijou v. Alton Ochsner Med. Found., 95-3074, p. 4 (La.9/5/96), 679 So.2d 893, 896; Russo v. Vasquez, 94-2407, p. 5 (La.1/17/95), 648 So.2d 879, 882. The Act limits the liability of a single qualified health care provider to $100,000.00 plus interest for all malpractice claims for injuries to or death of a patient. La. R.S. 40:1299.42(B)(2). Any damages awarded or agreed to in excess of $100,000.00 may be recovered from the Fund; however, the total amount recoverable, exclusive of future medical care and related benefits, shall not exceed $500,000.00 plus interest and cost. La. R.S. 40:1299.42(B)(1) and (3).
As an initial matter, we note the Fund spends considerable time arguing that the statutory admission of liability provided by La. R.S. 40:1299.44(C)(5)(e) does not apply in this case. We agree. As it currently exists, La. R.S. 40:1299.44(C)(5)(e) provides:
In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the trier of fact shall consider the liability of the health care provider as admitted and established where the insurer has paid its policy limits of one hundred thousand dollars, or where the self-insured health care provider has paid one hundred thousand dollars.[1]
According to the clear language of the Act, the procedure detailed in La. R.S. 40:1299.44(C) applies when "the insurer of a health care provider or a self-insured health care provider has agreed to settle its liability on a claim against its insured and claimant is demanding an amount in excess thereof from the patient's compensation fund for a complete and final release." In the instant case, nothing in the record indicates the existence of an agreement between the health care providers and the plaintiff to settle their liability in exchange for anything. This case simply does not involve a settlement of liability. Rather, it involves a payment in satisfaction of an adverse judgment. Consequently, the provisions of La. R.S. 40:1299.44(C), including subsection (C)(5)(e), do not apply to this case.
In holding that the Fund could not contest the liability of the physicians on appeal, the court of appeal relied upon this court's decision in Koslowski, 576 So.2d 470 (La.1991), wherein we held, apparently relying on the provisions of former La. R.S. 40:1299.44(C), that a post-judgment settlement prevented the Fund from contesting liability on appeal. In Koslowski, the plaintiff suffered permanent nerve damage and facial dysesthesia as a result of a substandard root canal. After a trial on the merits, a jury awarded Ms. Koslowski $250,000.00 for her injuries suffered as a result of her dentist's malpractice. Shortly after the rendition of judgment, Ms. Koslowski executed a release of the dentist, his dental clinic, and the two defendant insurance companies for the stated consideration of $100,000.00, reserving her rights for the excess judgment against the *667 Fund. While the release acknowledged receipt of $100,000 "or its equivalent," Ms. Koslowski was only paid $93,500.00. The insurer settled for this lesser amount by arguing that the costs of the jury and the medical review panel should be deducted from the plaintiff's recovery. Id. at 473. The Fund appealed, contesting both liability and damages.
After granting certiorari, this court was faced with two issues: (1) whether there was a settlement for $100,000 on behalf of the health care provider; and (2) if so, whether the $100,000 settlement after trial prevented the Fund from contesting liability on appeal. Id. First, we concluded that "[a]llowing a small discount for prompt payment does not alter the fact that the insurer of the health care provider settled the claim against its insured as required by the statute." Id.[2] Next, we determined that "[t]he fund cannot contest liability when there is a binding settlement for $100,000 by the health care provider, either before or after trial." Id. at 474.
The holding in Koslowski that the fund cannot contest liability when there is a post-trial settlement for $100,000 does not apply to this case, however, because the facts in Koslowski vary greatly from the facts at issue in this case. In Koslowski, the plaintiff executed a release of the qualified health care provider and his insurer. More importantly, Ms. Koslowski settled for less than the full amount to which she was entitled pursuant to the judgment in her favor. In the instant case, the qualified health care providers elected not to appeal the judgment against them and instead tendered full payment in satisfaction of the judgment. The record contains no indication that a release was executed.[3] Furthermore, each physician paid plaintiff at least $100,000, so there was no settlement varying the amounts awarded by the judgment. Because our decision in Koslowski is inapplicable to the instant situation, we need not review our analysis in that case at this time.
The above finding that La. R.S. 40:1299.44(C)(5)(e) does not apply to establish the liability of the health care providers, however, does not end our inquiry. We must still determine, without the benefit of subsection (C)(5)(e) or our previous decision in Koslowski, whether the Fund is entitled to contest the jury's finding of liability on the parts of the qualified health care providers when the physicians have satisfied the judgment against them by each paying the statutory maximum of $100,000.
This court has long recognized that a suit brought under the MMA is against the health care provider only and the Fund is not a party defendant against whom the action can be brought. Bonano v. Jefferson Parish Hosp. Serv. Dist. No. 2, 95-2799, p. 1 (La.1/26/96), 666 So.2d 653, 653 (per curiam); Thomas v. Insurance Corp. Of America, 93-1856, p. 4 (La.2/28/94), 633 *668 So.2d 136, 139; Stuka v. Fleming, 561 So.2d 1371, 1374 (La.1990); Felix v. St. Paul Fire & Marine Ins. Co., 477 So.2d 676, 680 (La.1985); Williams v. Kushner, 449 So.2d 455, 458 (La.1984). We have also previously reasoned that when the Fund is defending an action for excess damages after a plaintiff has settled with a health care provider, it is in the nature of a statutory intervenor since it is a third person who has an interest in the proceedings between the plaintiff and the health care provider due to the fact that any damages in excess of $100,000 are payable from the Fund. Stuka, 561 So.2d at 1374; Felix, 477 So.2d at 680-81; Williams, 449 So.2d at 458 n. 16. This reasoning has been extended to appeals from judgments following a trial on the merits:
Similarly, after a judgment is rendered in a suit between the claimant the health care provider awarding damages against the health care provider in excess of one hundred thousand dollars, the commissioner and the fund have an interest in the action for the purpose of appealing the excess judgment against the fund. La.Code Civ. P. arts. 1091 and 2086. Accordingly, the trial judge was correct in granting the intervention of the commissioner and the fund for the purpose of appealing the excess judgment.
Felix, 477 So.2d at 681.
These principles lead to the conclusion that the MMA "contemplates that the issue of liability is generally to be determined between the malpractice victim and the health care provider, either by settlement or by trial, and that the Fund is primarily concerned with the issue of the amount of damages." Stuka, 561 So.2d at 1374. Thus, liability is generally an issue to be determined between the claimant and the health care provider, while the Fund has an interest in the issue of excess damages.
The validity of the statement that the claimant and the health care provider determine the issue of liability and the Fund is interested in the issue of excess damages is supported by La. R.S. 40:1299.44(C)(6), which, as previously noted, applies when the health care provider or his insurer has agreed to settle its liability and plaintiff is demanding an amount in excess thereof from the Fund for a complete and final release. That subsection provides:
Any settlement approved by the court shall not be appealed. Any judgment of the court fixing damages recoverable in any such contested proceeding shall be appealable pursuant to the rules governing appeals in any other civil court case tried by the court.
Thus, the settlement itself, which is between the health care provider and the plaintiff, cannot be appealed, but the amount of damages assessed by the court, which can include excess damages to be paid by the Fund, may be appealed.
We have also recognized that the Fund has standing to appeal a district court's judgment granting a health care provider's exception of prematurity when there is a question as to whether the health care provider is a qualified health care provider under the MMA. Bennett v. Krupkin, 01-0209 (La.10/16/01), 798 So.2d 940. The Bennett decision was based on several provisions of the MMA that give the Patient's Compensation Fund Oversight Board the responsibility and authority for the Fund's management and defense. Specifically, we noted that the version of La. R.S. 40:1299.44(D)(2)(b)(x) in effect at the time expressly granted the Board the authority to:
Defend the fund from all claims due wholly or in part to the negligence or liability of a non-covered health care provider or a product manufacturer, or *669 both, regardless of whether a covered health care provider has settled or paid its statutory maximum, or has been adjudged liable or negligent.

(Emphasis added.) We reasoned that the Board was the entity statutorily responsible for defending the Fund and it therefore had an interest in a judicial determination of whether the defendant physician was a qualified health care provider under the MMA. Bennett, 01-0209 at p. 6, 798 So.2d at 944. Accordingly, citing La. C.C.P. arts 1091, 2083, and 2086, we held that the Board could have intervened in the trial court and, consequently, had a right to appeal the judgment granting the exception of prematurity when the issue involved the status of the defendant physician. The Bennett holding is clearly inapplicable in this case, however, since there is no dispute that the defendant physicians are qualified health care providers under the MMA. Moreover, we decline to extend the analysis used in Bennett to somehow afford the Fund an implied right to appeal the judgment of liability in this case.
Following the Bennett decision, the Act was amended to specifically allow the Fund to "[i]ntervene as a matter of right, at its discretion, in any civil action or proceeding in which the constitutionality of this Part ... or any other Louisiana law related to medical malpractice ... is challenged." La. R.S. 40:1299.44(D)(2)(b)(xii). Thus, while the legislature has seen fit to give the Fund the specific right to intervene in any action in which the constitutionality of a law related to medical malpractice is at issue, it has not chosen to expressly allow the Fund to intervene and appeal a district court's judgment of liability.
The MMA is special legislation in derogation of the rights of tort victims and it must be strictly construed against limiting the victim's rights against the tortfeasor. Ginn v. Woman's Hosp. Found., Inc., 02-1913, p. 10 (La.4/9/03), 842 So.2d 338, 344; Spradlin v. Acadia-St. Landry Med. Found., 98-1977, p. 6 (La.2/29/00), 758 So.2d 116, 120; Branch v. Willis-Knighton Med. Ctr., 92-3086, p. 14 (La.4/28/94), 636 So.2d 211, 217. In light of this basic principle, we cannot interpret the statute to impliedly give the Fund the authority to appeal the issue of liability in the case sub judice. To do so would essentially make the Fund a party to the suit, which is contrary to our repeated pronouncement that the Fund is not a party defendant in medical malpractice suits between a claimant and a health care provider, and give it a greater interest than we have previously recognized is proper.
As previously explained, the Fund's interest lies in the issue of the amount of damages. Thus, once judgment in excess of $100,000 is rendered following a trial on the merits, the Fund has an interest for the purpose of appealing the excess judgment against the Fund and may intervene to appeal that issue. La. C.C.P. arts. 1091 and 2086. See also Felix, 477 So.2d at 681. When the qualified health care providers each chose not to appeal and satisfied the judgment against them, the judgment of liability became final. Nothing in the MMA gives the Fund the right to appeal this portion of the judgment. While the Fund may intervene and appeal the issue of excess damages, it may not appeal the issue of the health care providers' liability. Accordingly, although we disagree with the reasoning it employed, we find the court of appeal was correct in holding that the Fund is precluded from contesting liability.[4]
*670 In its final assignment of error, the Fund argues the court of appeal erred in affirming the jury's award of future medical expenses to plaintiff because no medical evidence as to the nature, extent, and amount of such future expenses is contained in the record. In 1984, the legislature added provisions to the MMA that afforded malpractice victims recovery for future medical care and related benefits. Kelty v. Brumfield, 93-1142, p. 10 (La.2/25/94), 633 So.2d 1210, 1216. The goal of this legislation was to provide some remedy to the damage cap's harsh tendency to restrict recovery inversely to the injury. Id. at p. 10, 633 So.2d at 1216-17. Furthermore, the legislation demonstrated the legislature's preference for an administrative medical relief program over the path taken by other states, namely increasing the statutory cap. Id.
La. R.S. 40:1299.43 governs awards for future medical care and requires that in all malpractice claims that proceed to trial, the jury shall be given a special interrogatory asking whether the plaintiff is in need of future medical care and related benefits and the amount thereof.[5] As amended in 2004, La. R.S. 40:1299.43 provides in part (and with the amendments indicated):
A. (1) In all malpractice claims filed with the board which proceed to trial, the jury shall be given a special interrogatory asking if the patient is in need of future medical care and related benefits that will be incurred after the date of the response to the special interrogatory, and the amount thereof.
(2) In actions upon malpractice claims tried by the court, the court's finding shall include a recitation that the patient is or is not in need of future medical care and related benefits that will be incurred after the date of the court's finding and the amount thereof.
(3) If the total amount is for the maximum amount recoverable, exclusive of the value of future medical care and related benefits that will be incurred after the date of the response to the special interrogatory by the jury or the court's finding, the cost of all future medical care and related benefits that will be incurred after the date of the response to the special interrogatory by the jury or the court's finding shall be paid in accordance with R.S. 40:1299.43(C).
(4) If the total amount is for the maximum amount recoverable, including the value of the future medical care and related benefits, the amount of future medical care and related benefits that will be incurred after the date of the response to the special interrogatory by the jury or the court's finding shall be deducted from the total amount and shall be paid from the patient's compensation fund as incurred and presented for payment. The remaining portion of the judgment, including the amount of future medical care and related benefits incurred up to the date of the response to the special interrogatory by the jury or the court's finding shall be paid in accordance with R.S. 40:1299.44(A)(7) and R.S. 40:1299.44(B)(2)(a), (b), and (c).

*671 (5) In all cases where judgment is rendered for a total amount less than the maximum amount recoverable, including any amount awarded on future medical care and related benefits that will be incurred after the date of the response to the special interrogatory by the jury or the court's finding, payment shall be in accordance with R.S. 40:1299.44(A)(7) and R.S. 40:1299.44(B)(2)(a), (b), and (c).
(6) The provisions of this Subsection shall be applicable to all malpractice claims.
B. (1) "Future medical care and related benefits" for the purpose of this Section means all of the following:

(a) all All reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services, incurred after the date of the injury up to the date of the settlement, judgment, or arbitration award.

(b) All reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provisions of such services, after the date of the injury that will be incurred after the date of the settlement, judgment, or arbitration award.
(2) "Future medical care and benefits" as used in this Section shall not be construed to mean non-essential specialty items or devices of convenience.
C. Once a judgment is entered in favor of a patient who is found to be in need of future medical care and related benefits that will be incurred after the date of the response to the special interrogatory by the jury or the court's finding or a settlement is reached between a patient and the patient's compensation fund in which the provision of medical care and related benefits that will be incurred after the date of settlement is agreed upon and continuing as long as medical or surgical attention is reasonably necessary, the patient may make a claim to the patient's compensation fund through the board for all future medical care and related benefits directly or indirectly made necessary by the health care provider's malpractice unless the patient refuses to allow them to be furnished.
D. Payments for medical care and related benefits shall be paid by the patient's compensation fund without regard to the five hundred thousand dollar limitation imposed in R.S. 40:1299.42.
E. (1) The district court from which final judgment issues shall have continuing jurisdiction in cases where medical care and related benefits are determined to be needed by the patient.
* * *
In response to the district court's special interrogatory, the jury awarded plaintiff $2,435,040.00 in future medical expenses and the court entered its judgment consistent with the jury's award. The Fund urges that plaintiff failed to establish with some degree of certainty that he was in need of future medical treatment and he presented no medical evidence or testimony to the jury substantiating his claims for future treatment or setting out the probable cost of any such treatment and care.
The trier of fact has much discretion in the assessment of damages, and an appellate court will only disturb such awards when there has been a clear abuse of that discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340. Appellate courts review the evidence in the light most favorable to the prevailing party to determine whether the trier of fact was clearly wrong in its conclusions. Id.
*672 Future medical expenses must be established with some degree of certainty and will not be awarded in the absence of medical testimony that they are indicated and sets out their probable cost. Duncan v. Kansas City So. Railway Co., 00-0066, p. 17 (La.10/30/00), 773 So.2d 670, 685. However, this court has noted that
[w]hen the record establishes that future medical expenses will be necessary and inevitable, the court should not reject an award of future medical expenses on the basis that the record does not provide the exact value of the necessary expenses, if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required.
Stiles v. K Mart Corp., 597 So.2d 1012, 1013 (La.1992) (per curiam).
Expert testimony may not always be required to support a malpractice victim's need for future medical care in cases where the need for such medical care is obvious and certain to the layperson. See Blocker v. Rapides Regional Med. Ctr., 03-745, p. 4 (La.App. 3 Cir. 12/23/03), 862 So.2d 1220, 1223. In Pfiffner v. Correa, 94-0924 (La.10/17/94), 643 So.2d 1228, we held that expert testimony is not always necessary for a plaintiff to meet his burden of proof in establishing his medical malpractice claim when objective evidence adduced at trial is such that a lay jury can infer negligence from the facts. We noted, however, that most medical malpractice cases are so complex that a plaintiff will likely fail to sustain his burden of proof in the absence of medical experts. Id. at p. 9, 643 So.2d at 1234. Similarly, in the instant case, we find there are certain situations in which sufficient evidence is produced at trial such that the jury could reasonably conclude the necessity for and extent of future medical care without direct expert medical testimony. In such cases, a jury's award of future medical costs will not be overturned merely for the lack of specific expert medical testimony on delineating the malpractice victim's future medical costs. See Stiles, 597 So.2d at 1013.
Although plaintiff did not offer physician testimony solely directed towards the issue of his future medical costs or needs, medical testimony on his likely future care was presented to the jury during Dr. Lewis Silverman's and Dr. Francis Bride's testimony. Dr. Silverman testified that future medical treatment and surgical corrections could become necessary to treat plaintiff's incisional hernia, which was depicted in photographs. He also testified to the effects and complications related to the "outpouching" of the hernia and abdominal muscles. In his testimony, Dr. Bride noted that it was "obvious" that plaintiff was in need of continued medical treatment in the immediate future for his numerous medical problems. Furthermore, plaintiff offered the testimony of Dr. John Grimes,[6] an expert in the fields of rehabilitation and vocational counseling and life care planning, to show that the most appropriate approach to formulating a life care plan is to look at the historical evidence of plaintiff's problems and medical needs and to use this evidence to estimate future costs. Plaintiff also offered the testimony of Dr. Charles Bettinger,[7] who was recognized by the court as an expert in the field of economics and statistics. Dr. Bettinger testified that given the varied needs of plaintiff due to his numerous medical conditions, *673 an appropriate and reasonable indicator of future medical costs was the annual costs plaintiff incurred once his condition had stabilized after the initial trauma and immediate complications. Dr. Bettinger testified that once the medical bills for the first year of plaintiff's injuries were removed, the average of plaintiff's medical costs was $76,433 per year. The bills associated with those costs were primarily related to plaintiff's pancreatitis, feeding tube, and hernia. Dr. Bettinger then testified as to plaintiff's life expectancy and calculated the present value of the estimated cost of plaintiff's future medical care over his life expectancy to be $2,435,040. Dr. Bettinger further testified that the lowest annual amount of plaintiff's past medical bills was $42,764. He calculated that using this amount, rather than the average amount used in the previous calculation, over plaintiff's life expectancy would yield future medical costs in the amount of $1,310,930. Dr. Bettinger testified that these figures provided a range of plaintiff's estimated future medical costs.
While somewhat non-specific, there was expert testimony related to plaintiff's need for future medical care. Based on the testimony presented to the jury on this issue, as well as the nature and severity of plaintiff's medical condition, we cannot, viewing the evidence in the light most favorable to plaintiff, say the jury's award of future medical expenses was an abuse of its discretion. The jury obviously accepted Dr. Bettinger's estimation of the plaintiff's future medical costs and the record does not indicate this choice was an abuse of its vast discretion. Furthermore, we note that the future medical care award is not a lump sum award payable immediately to plaintiff, but rather will be paid out by the Fund pursuant to the provisions of La. R.S. 40:1299.43 as they are incurred. See Hall v. Brookshire Bros., Ltd., 02-2404 (La.6/27/03), 848 So.2d 559. We will not disturb the award of future medical expenses and find the judgment affirming the jury's award of future medical costs was correct.

Conclusion
For the above reasons, we conclude that the Fund is precluded from appealing a district court's judgment of liability against a qualified health care provider when the qualified health care provider has elected not to appeal that finding and has satisfied the judgment against him. Accordingly, we affirm the judgment of the court of appeal denying the Fund's right to contest liability and refusing to consider the Fund's assignment of error regarding the jury's finding of liability. Furthermore, we affirm the court of appeal's judgment upholding the jury's award of future medical expenses.
AFFIRMED.
CALOGERO, Chief Justice, concurs and assigns reasons.
VICTORY, Justice, dissents in part and assigns reasons.
CALOGERO, Chief Justice, concurs and assigns reasons.
I concur in order to clarify the manner in which the Medical Malpractice Act ("MMA") will apply to the district court's somewhat vague judgment of over four million dollars in this case. Although no party has suggested to the contrary, I observe that applying the relevant provisions of the MMA to the judgment actually yields a present entitlement of much less than the total judgment amount. The district court could have, and probably should have, specified that (1) after the $100,000 owed by each of the two doctors is deducted from the $500,000 statutory cap, La. Rev.Stat. 40:1299.42(B)(1), the PCF is to pay the plaintiffs $300,000 plus interest *674 and costs; (2) the PCF is to pay the plaintiffs $628,860.32 in past medical expenses plus interest from the date of demand; and (3) the plaintiff is a "patient in need" who is entitled to future medical care and related benefits from the PCF to be paid when and as incurred under La. Rev.Stat. 40:1299.43.
VICTORY, J., dissenting in part.
As the majority opinion recognizes, "once judgement in excess of $100,000 is rendered following a trial on the merits, the Patient Compensation Fund ("PCF") has an interest for the purpose of appealing the excess judgment against the PCF and may intervene to appeal that issue." Op. at 669. While I agree that the PCF may not then appeal the issue of the health care providers' liability, as we have clearly held, even where the health care provider has settled with the plaintiff for $100,000, "at the trial against the Fund, the plaintiff has the burden of proving that the admitted malpractice caused damages in excess of $100,000." Graham v. Willis-Knighton Medical Center, 97-0188 (La.9/9/97), 699 So.2d 365, 372; Conner v. Stelly, 02-0280 (La.1/30/02), 807 So.2d 827; Hall v. Brookshire Bros., Ltd., 02-2404 (La.6/27/03), 848 So.2d 559. In Hall, we explained the rationale for this rule as follows:
Liability implies some damage, but not specifically which damage or how much. Moolekamp v. Rubin, 531 So.2d 1124, 1126-1127 (La.App. 4 Cir.1988). Having proven that defendant's fault caused damage, a plaintiff must further prove what damage, by kind and seriousness, was caused by defendant's fault before the court can render an appropriate award. Id.

A defendant is only liable for that damage caused by his or her fault. Fault is a broad concept, encompassing all conduct falling below a proper standard. Weiland v. King, 281 So.2d 688, 690 (La.1973), citing Langlois v. Allied Chemical Corporation 258 La. 1067, 249 So.2d 133 (1971).
When a defendant stipulates to liability, that defendant acknowledges that his or her fault (substandard performance of a legal duty owed to plaintiff for the protection from certain risks of harm) caused the plaintiff to sustain some damage (in the case of the qualified health care provider under the Medical Malpractice Act, that defendant stipulates that the damage he or she caused is at least $100,000).
However, there can be, and frequently is, more than one cause of a plaintiff's damages. Graves v. Page 96-2201 (La.11/7/97), 703 So.2d 566, 570; Syrie v. Schilhab 96-1027 (La.5/20/97), 693 So.2d 1173, 1179. Because a defendant is liable only for that damage caused by his or her fault, when a defendant stipulates to liability for fault, he or she does not thereby necessarily concede responsibility for 100% of the fault.
In the same vein, when a health care provider tenders payment of $100,000.00, thereby admitting and establishing "liability," that admission of liability is an admission of fault and causation of damages of at least $100,000.00. It is not an admission of the percentage of fault attributable to the health care provider; nor is it an admission as to the extent of the claimant's damages beyond $100,000.00. Louisiana Revised Statute 40:1299.44(C)(5) speaks directly and exclusively to the liability of the health care provider; it is silent with respect to the responsibility of any other actor.
Louisiana Civil Code article 2323 requires that the fault of every person responsible for a plaintiff's injuries be compared, whether or not they are parties, *675 regardless of the legal theory of liability asserted. As we explained in Dumas v. State, Department of Culture, Recreation & Tourism XXXX-XXXX (La.10/15/02), 828 So.2d 530, 537: "The comparative fault article, La. C.C. art. 2323, makes no exceptions for liability based on medical malpractice; on the contrary, it clearly applies to any claim asserted under any theory of liability, regardless of the basis of liability." Thus, in the trial against the Fund, wherein the plaintiff retains the burden of proving that the admitted malpractice caused damages in excess of $100,000.00, evidence that victim or third party fault caused any of the damages is clearly relevant and admissible. Conner, supra.

Hall, supra at 568.
The same reasoning applies when a judgment in excess of $100,000 is rendered against a health care provider following a trial on the merits. Thus, while the PCF may not contest the physician's "liability," the PCF may challenge on appeal the jury's finding that the physicians' malpractice caused damages in excess of the $100,000 each physician paid in satisfaction of the judgment rendered against him. The majority opinion does not address the PCF's argument that the plaintiffs failed to prove a causal connection between the physician's failure to perform certain tests caused plaintiffs' damages, including Mr. Hanks' subsequent complications. The majority opinion apparently takes the view that the PCF failed to assign the causation issue as error in the court of appeal and thus the issue is not properly before this court. I disagree.
The PCF assigned the following errors in the court of appeal:
1. The jury committed manifest error in finding that plaintiffs established the applicable standards of care with regard to the preoperative, operative and post-operative treatment afforded Mr. Hanks in this case and, assuming the standards of care were proved, in finding that Drs. Seale and Ledet breached those standards.
2. The jury clearly erred in awarding plaintiffs future medical expenses without any medical evidence in the record as to the nature, extent and amount of such expenses.
In discussing the preoperative standard of care and breach in that same document, the PCF stated:
Further, even if these tests are considered the standard, there is not a shred of evidence that failure to perform these tests caused damage to the plaintiffs; to the contrary, all of the testimony, except that of Dr. Silverman who could only say he was unsure on the matter, established that none of the conditions sought to be detected by these tests existed in this case. In other words, even had the tests been done, they would not have uncovered anything that would have changed the surgical decision or which led to the post surgical complications experienced by Mr. Hanks. Therefore, the PCF submits it was unreasonable on this record for the jury to find liability based on any preoperative actions by the defendants, and so manifest error occurred in the trial court.
In the section of the appellate brief entitled "Standard of care and breach as pertains to the surgery of April 13, 1998," the PCF further argued that:
Moreover, plaintiffs put on no evidence to establish a causal link between the alleged surgical deficiencies and Mr. Hanks' subsequent complications. To the contrary, the post-operative medical records demonstrate that the surgery was properly performed, as Mr. Hanks, according to the medical records was *676 experiencing fleeting abdominal distension, was able to tolerate food and liquids following the surgery, passed urine and had bowel movements, and a gastrografin test two (2) days after surgery showed the ability of matter to pass through the esophagus into the stomach with some reflux  i.e., the ability of air to pass out through the esophagus.
Finally, in its concluding paragraph, the PCF again urged:
Even assuming these standards were proved, plaintiffs failed to establish a breach of these standards by Drs. Seale and Ledet or a causal link of any such breach to the complications suffered by Mr. Hanks. Consequently, the jury's verdict of liability in this case is unreasonable on this record, constitutes manifest error, and mandates that the Judgment in this matter be reversed.
In its writ application to this Court, the PCF assigned the same errors as in its appellate brief, and one more not relevant to this dissent. In its "Summary of the Argument," the PCF argued to this Court as follows:
In the case sub judice, considering the assignment of errors to liability raised by the Fund, the jury committed manifest error in finding that the plaintiffs established the applicable standards of care with regard to the pre-operative, operative and post-operative treatment rendered to Mr. Hanks. The testimony of plaintiffs' expert, Dr. Lewis F. Silverman, is not credible and is contrary to that of four other medical experts who testified in this case, as detailed in brief, and the facts established by the medical records. First, there is no consensus on whether manometry or EGD studies were required and even if these tests are considered the standard, there is not a shred of evidence that the failure to perform these tests caused damage to the plaintiff. Secondly, the plaintiffs failed to establish the applicable standard of care as it pertains to the surgery of April 13, 1998 and put on no evidence to establish a causal link between the alleged surgical deficiencies and Mr. Hanks' subsequent complications.
The PCF went on to discuss causation in the same manner as it did in the court of appeal brief. The PCF's brief to this Court discussed causation numerous times as follows:
Nevertheless, at the trial against the PCF, the plaintiff has the burden of proving that the admitted malpractice caused damages in excess of $100,000.00. Moreover, the PCF may argue and present evidence before the trier of fact that victim or third-party fault caused, in whole or in part, the excess damages sought. [Cites omitted.]
. . .
Further, even if these tests are considered the standard, there is not a shred of evidence that failure to perform these tests caused damage to the plaintiffs; to the contrary, all of the testimony, except that of Dr. Silverman who could only say he was unsure on the matter, established that none of the conditions sought to be detected by these tests existed in this case.
. . .
Moreover, plaintiffs put on no evidence to establish a causal link between the alleged surgical deficiencies and Mr. Hanks' subsequent complications.
. . .
With regard to the PCF's challenges to liability, the overwhelming evidence in the record establishes that plaintiffs failed to prove the applicable standards of care pertaining to the preoperative, operative and post-operative care rendered *677 to Mr. Hanks by Drs. Seale and Ledet. Even assuming these standards were proved, plaintiffs failed to establish a breach of these standards by Drs. Seale and Ledet or a causal link of any such breach to the complications suffered by Mr. Hanks.
While La. C.C.P. art. 2129 provides that "[a]n assignment of errors in not necessary in any appeal," the courts of appeal and this Court have specific rules governing the contents of writ applications. Rule 1-3 of the Uniform Rules-Louisiana Courts of Appeal, entitled Scope of Review, provides:
The scope of review in all cases within the appellate and supervisory jurisdiction of the Courts of Appeal shall be as provided by LSA-Const. Art. 5, § 10(B), and as otherwise provided by law. The Courts of Appeal will review only issues which were submitted to the trial court and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise.
Likewise, La. Sup.Ct. R. X, § 1(b), requires that "[t]he application for writs shall address, in concise fashion, why the case is appropriate for review under the considerations stated in subsection (a) above." As further provided in civil cases, La. Sup.Ct. Rule X, § 3(3) requires the applicant to submit assignments of error and "[a]n argument of each assignment of error on the facts and law, addressing particularly why the case is appropriate for review under the considerations stated in Section 1(a) of this rule." This rule allows for the best use of our judicial function in developing Louisiana jurisprudence. Boudreaux v. State, Dept. Of Transp. and Development, 01-1329 (La.2/26/02), 815 So.2d 7, 10 (finding that the DOTD abandoned arguments made in its assignments of error but which it chose not to brief). "Correlatively, if this Court is to sharpen the focus on those issues most worthy of consideration and hasten the decisional process, it is imperative that we not be blind sided after we grant a writ application with questions which did not appear in the application for a writ of certiorari." Id. at pp. 10-11.
This is hardly a case where this Court or the court of appeal was blindsided with an issue after the writ was granted or where a party failed to address an issue in a writ application or appellate brief. A fair reading of the PCF's assignment of error to the court of appeal in its appellate brief and to this Court in its writ application, that the jury committed manifest error "in finding that plaintiffs established the applicable standards of care" and "assuming the standards of care were proved, in finding that Drs. Seale and Ledet breached those standards" by its very nature necessarily includes the causation argument. While this assignment may be a bit inartfully drafted, it clearly put the court of appeal and this Court on notice that causation is an issue on appeal. This is particularly true in light of the fact that, as previously pointed out in this dissent, the PCF raised the causation issue numerous times in detail in its appellate brief as well as in its writ application and brief to this Court. Thus, in my view, this Court should address the PCF's argument on appeal that the physician's malpractice did not cause damages in excess of $100,000.
For the above reasons, I respectfully dissent in part.
NOTES
[1] Effective July 1, 2003, Act No. 882 of 2003 amended and reenacted La. R.S. 40:1299.44(C)(5), moving the substance of the quoted provision from La. R.S. 40:1299.44(C)(5) to La. R.S. 1299.44(C)(5)(e). Section 2 of Act 882 provides in part that the enactment of La. R.S. 40:1299.44(C)(5)(e) was "procedural and interpretative in nature" and "intended to clarify and codify existing law." The current version of the provision became effective while the case was on appeal. We need not address any issue of retroactivity as the substance of both versions of the provision is the same and our analysis in this case would remain the same under either version. Additionally, the Fund refers to the amended version of subsection (C)(5) in its brief to this court.
[2] Subsequently, in Russo v. Vasquez, 94-2407 (La.1/17/95), 648 So.2d 879, we held that a settlement of less than the full amount of $100,000 is insufficient to trigger the Fund's statutory liability for excess damages and does not preclude the fund from contesting the qualified health care provider's liability. We therefore overruled Koslowski to the extent it was inconsistent with the Russo opinion. Id. at p. 9, 648 So.2d at 884.
[3] Plaintiff's brief to this court states that the physicians paid the judgment in full without the benefit of a release. In contrast, the Fund's reply brief indicates that plaintiffs signed a Release and Satisfaction of Judgment, acknowledging that they had received the total sum of $255,960.98 from the physicians and, as such, released and discharged them from any further liability in connection with the district court's judgment. In any case, the record does not contain a release executed by plaintiff.
[4] Because we have determined that the Fund cannot contest the liability of the qualified health care providers, we need not address its assignment of error that the jury erred in finding that plaintiff established the applicable standards of care with regard to the preoperative, operative, and post-operative treatment afforded plaintiff and in finding that the physicians breached those standards.
[5] Effective August 15, 2004, Act No. 181 of 2004 amended and reenacted certain provisions of La. R.S. 40:1299.43(A), (B), and (C). The issue of the Act's applicability is not before us and is not relevant to the issue presented in the Fund's final assignment of error.
[6] Dr. Grimes holds a Ph.D. in psychology, but is not a medical doctor.
[7] Dr. Bettinger holds a Ph.D. in his field, but is not a medical doctor.